UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| **CONSWELLA MURPHY,**<br><br>    **Plaintiff,**<br><br>V.<br><br>**PIKE COUNTY DETENTION CENTER,** *et al.*,<br><br>    **Defendants.** | CIVIL ACTION NO. 7:18-15-KKC<br><br><br>**OPINION AND ORDER** |

*** *** ***

This matter is before the Court on Defendants' motion for summary judgment. (DE 29.) For the reasons stated below, Defendants' motion is **GRANTED**.

## I. BACKGROUND

This case stems from an alleged beating at the Pike County Detention Center ("PCDC"). Plaintiff, Conswella Murphy, alleges that while she was at the PCDC she was "severely beaten" by "unknown John or Jane Does 1 through 10." (DE 1-1 at 3.)

On August 6, 2017, Kentucky State Police stopped four individuals traveling in a vehicle: Murphy, her boyfriend Sid Gibson, and two other men. At the time of the stop, Murphy was arrested for flagrant non-support. Gibson was also arrested for violating an emergency protective order that Murphy had against him for past abuse. At the time of her arrest, Murphy swallowed a few baggies, which she stated, "may have been meth." (DE 29-3 at 5.) Unknowing of Murphy's drug consumption, police transported her to the Pike County Detention Center. Murphy stated that she does not recall the officer informing her why the vehicle was pulled over. According to Murphy, she recalls that an officer brought her a drink cup, but she does not recall anything afterwards. (DE 26 at 33.) The next day, she recalls waking up in the hospital

1

and not knowing why she was there. Murphy was informed by her mother, Wanda Gay Murphy ("Wanda"), and sister, Tina Ann Murphy ("Tina"), that she had been beaten. (DE 26 at 38 and 53.)

Murphy's medical records show that when she was transported to the hospital, she was incoherent, unable to speak, and thrashing around. (DE 30-2 at 2.) She had bruises and lacerations on her feet, legs, face, and elbows. Hospital records indicate that Murphy had multiple baggies removed from her stomach. Murphy was treated at the hospital for respiratory failure, unspecified hypoxia, pneumonia, sepsis, and rhabdomyolysis. Her records indicate that during her stay, she had to have her heart restarted and two feet of her bowels re-sectioned during surgery removing the baggies. Hospital records also document bruising and lacerations throughout her body. (*See* DE 29-2 and 30-3.)

According to Tina, Murphy did not appear bruised the last time she saw her—earlier on the day of her arrest. (DE 28 at 11.) Tina stated that on August 7, 2017, she received a phone call from an unknown nurse at the hospital stating that Murphy had been brought in, and it looked like she had been "beaten to death." (DE 28 at 7.) Upon arrival, Tina stated that she first thought that Gibson had beat Murphy. (DE 28 at 11.) She stated that an unknown trauma doctor told her that he had "never seen a person's body beat to that extent." (DE 28 at 9.) Tina stated that it was discovered later that Murphy had swallowed baggies and needed surgery. (DE 28 at 27.)

According to Wanda, she received a call on August 7, 2017 from Tina who told her that Murphy was in the hospital and in bad shape. (DE 27 at 6.) Wanda stated that she believed Murphy was beaten "by looking at her" and "no one at the hospital told [her] that [her daughter had been beaten.]" (DE 27 at 13-14.) Wanda further stated that she has seen Murphy's mugshot, which she asserts does not show any bruising. (DE 27 at 13.)

Several employees of the PCDC testified that they were not aware of any beating that occurred. Brian Morris, who did not serve as Pike County Jailer at the time of the incident but

2

served in that capacity at the time of the Complaint, testified that the facility and medical records show that "Murphy swallowed baggies of a substance (possibly meth) prior to entering the detention center" and "[a]t some point one of the baggies burst and caused the medical distress observed." (DE 29-2 at 1.) Morris stated that once it was observed that Murphy was in distress, she was transported to the hospital. Morris stated that it appears that Murphy was properly monitored and housed while in the PCDC.

John Cooper, who served as Lieutenant during Murphy's incarceration, testified that according to an incident report he prepared on August 7, 2017:

> at approximately 0800 Deputy Alesha Adkins and Sgt. Colby Hobson went to isolation cell 125A to get inmate Murphy for Judge D. Mullins 9 a.m. court hearing. Inmate Murphy was charged with felony flagrant non-support in Pike County District Court. At that time Sgt. Hobson radioed for Lt. Cooper to come to isolation cell 125A because he (Sgt. Hobson) did not think inmate Murphy was mentally able to go to court. A that time, I Lt. Cooper, went to isolation door 122A where I could at that time smell a strong odor of feces. Upon getting to isolation cell 125A and speaking to inmate Murphy, I Lt. Cooper, seen that Murphy had took toilet paper and tore it apart in little pieces and had it all over the cell along with her feces. At that time, I Lt. Cooper asked inmate Murphy why she had made such a mess in her cell and Murphy replied that she had diarrhea. I Lt. Cooper noticed multiple red marks along inmate Murphy's legs and arms. I Lt. Cooper at that time asked Murphy what were the marks on her, and she replied that they were bruises and that she bruised very easily. I also asked if Murphy had been abused in any way before being arrested and booked at the Pike County Detention Center. Inmate Murphy replied "no". At that time, I informed Sgt. Hobson that we would not send inmate Murphy to court due to her mental state and I would contact Kentucky Mental Health and have inmate Murphy interviewed by MCC.
>
> At approximately 0831 I Lt. Cooper spoke with Triage Edwina Davis and informed her of inmate Murphy's actions so far. Triage Davis put inmate Murphy on a high-risk level due to her mental state. At approximately 1338 Deputy Adkins and Sgt. Hobson escorted inmate Murphy to the booking search and shower to be able to take a shower before being interviewed by MCC. Inmate Murphy was asked 2 to 3 times to take a shower. Deputy Adkins checked on inmate Murphy again and she was at that time sitting in the shower washing herself. At approximately 1500 Deputies Adkins and Angela Tackett gave inmate Murphy a clean uniform and escorted her to booking cell 130 to await the MCC interview. At that time, I Lt. Cooper was relieved by 2nd shift Sgt. Josh Carter and reviewed with Sgt. Carter on 1st shift details. At no time was inmate Murphy combative nor did my staff have to restrain inmate Murphy.

(DE 29-3 at 22-23.)

Alesha Adkins, who served as deputy jailer at the time of Murphy's incarceration, stated that she escorted Murphy to the shower during her stay. Adkins stated that Murphy appeared intoxicated and distressed. Adkins testified that Murphy appeared "unable to control her movements" and that she observed Murphy "lying on her back-moving her head side to side with arms and legs swinging in all directions." Adkins testified that she and "nurse Marcum and Tony Fields assisted in raising Inmate Murphy to a sitting position and then into a restraint chair to protect her from further injuring herself until EMS arrived." (DE 29-5.)

Tonya Fields, who also served as deputy jailer at the time of Murphy's incarceration, testified that she was present when Nurse Marcum determined that Murphy needed to be transported to the hospital. Fields testified that Murphy appeared "not to be able to control her movements" and that she observed Murphy "on the floor on her back moving her head from side to side and flailing her arms and legs in all directions." Fields stated that Nurse Marcum recommended that Murphy be restrained so that she does not further injure herself. She stated that she assisted Murphy into the restraint chair and, when EMS arrived, she accompanied Murphy to the hospital. (DE 29-6.)

Jason Fields, who served as Captain at the PCDC at the time of the incident, testified that he was present and interacted with Murphy while she was at the PCDC. Fields stated that Murphy began to display "erratic behavior[,]" and it was determined that she should be transported to the hospital. Fields stated that she was "placed in a restraint chair until EMS could arrive to prevent her from further harming herself." (DE 29-3 at 1.) Fields further testified that based upon his interaction with Murphy, his review of the incident reports, and review of the video interactions with Murphy, he is aware of the following timeline of events:

> On 8/7/2017, at approximately 1500, Lt. Johnny Cooper contacted Sgt. Josh Carter and informed that Inmate Conswella Murphy was placed into 130 for medical assessment due to triage being contacted by Lt. J. Cooper at 0831 on 8/7/17. Inmate Conswella Murphy was frequently checked on by PCDC Staff Sgt. J. Carter, J. Akers, and D. Emmons.

4

Inmate Conswella Murphy during detox check was laying on her back rubbing her legs, arms, and moving her feet against the floor.

On 8/7/2017, at approximately 1757, Deputy Jailer D. Emmons opened the door to 130 and asked Inmate Conswella Murphy if she would like something to eat. Inmate Murphy replied saying yes. Deputy Jailer D. Emmons opened the door to 130 and handed Inmate Conswella Murphy a tray. At this time, Inmate Conswella Murphy was rubbing her upper thighs and asked Deputy Jailer D. Emmons to rub it for her – which he did not do.

At approximately 1930 I checked on Inmate Conswella Murphy. At this time, Inmate Conswella Murphy laying on the floor talking to herself, she was rubbing her legs and moving her head side to side. I told Shift Supervisor Sgt. J. Carter to have medical staff see Inmate Conswella Murphy. I went to his office and immediately contacted Nurse C. Marcum to come to Booking and examine Inmate Conswella Murphy. Given her actions and appearance I was concerned that she was going to injure herself.

At 1936, Nurse C. Marcum observed inmate Murphy through the glass and informed Sgt. J. Carter that she needed to go the hospital. At 1938 J. Akers, T. Fields, and Nurse C. Marcum went into 130 to check on Inmate C. Murphy. At 1939, Nurse C. Marcum informed Sgt. J. Carter to call 911 for EMS. Deputy Jailer E. Collins called EMS. Nurse C. Marcum instructed me to restrain Inmate C. Murphy to prevent further injury to herself. Nurse C. Marcum and I agreed to place Inmate C. Murphy into a restraint chair. Deputy Jailer J. Akers and T. Fields, walked into 130 to move Inmate Conswella Murphy to the restraint chair. Deputy Jailer J. Akers, asked Inmate Conswella Murphy if she could reach her hand to her to help her up. Inmate Conswella Murphy replied saying yes and reached her hands up to Deputy Jailer J. Akers and T. Fields. At this time, Deputy Jailer J. Akers and T. Fields placed Inmate Conswella Murphy into the restraint chair.

At 1940, Nurse C. Marcum asked Inmate Conswella Murphy, "What is your name?" Inmate Conswella Murphy replied saying, "Conswella Murphy". Nurse C. Marcum asked if Inmate Conswella Murphy had taken anything or had anything to drink before coming to jail. Inmate Conswella Murphy replied saying, "Yeah." Inmate Conswella Murphy stated she had some beer before coming to jail. Nurse C. Marcum asked Inmate Conswella Murphy if she was an alcoholic. Inmate Conswella Murphy replied saying, "Hell no".

At 1942, Mountain Comprehensive Care worker, Martha Coleman, asked Inmate Conswella Murphy, "What is your name?" Inmate Conswella Murphy relied saying, "Conswella Murphy". Martha Coleman asked Inmate Conswella Murphy, "Do you know where you are at?" Inmate Conswella Murphy replied, "Yeah. In jail." Martha Coleman asked Inmate Conswella Murphy if she had taken any meth or methamphetamine recently. Inmate Conswella Murphy replied saying no. At 1946, EMS arrived into Booking. At 1947, EMS asked Inmate Conswella Murphy, "What is your name?" Inmate Conswella Murphy replied saying, "Conswella Murphy". EMS asked Inmate Conswella Murphy what's going on with you today. Inmate Conswella Murphy replied saying, "Diarrhea". At 1951, EMS departed with Inmate Conswella Murphy to Pikeville Medical Center. Deputy Jailer T. Fields escorted Inmate Conswella Murphy to Pikeville Medical Center."

(DE 29-3 at 1-2.)

Each of the witnesses from the PCDC also testified that they did not assault or use force against Murphy, and they were not aware of anyone who assaulted or otherwise used force against Murphy. Additionally, they testified that there was no culture of abuse among the employees of the jail toward the inmates and that the jailers were properly trained.

Murphy filed a Complaint asserting that she was beaten at the PCDC. She brought claims under 42 U.S.C. § 1983 and pursuant to the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution against the Pike County Detention Center, Brian Morris in his official capacity as Pike County Jailer, Freddie Lewis in his previous official capacity as the former Pike County Jailer, and John and Jane Does 1-10 ("Does 1-10"). Murphy also brought various state law claims against the Defendants.

Following a motion to dismiss, the Pike County Detention Center was terminated as a defendant, and several claims were dismissed. (DE 10.) The only claims remaining are Murphy's § 1983 claims alleging violations of her Fourth and Eighth Amendment rights against Does 1-10, § 1983 claims alleging violations of her Fourteenth Amendment rights against Morris and Lewis in their official capacities and Does 1-10, and state-law claims for intentional infliction of emotional distress against Does 1-10.

Defendants have moved for summary judgment on all remaining claims. (DE 29.) The Court finds below that there is no genuine dispute as to any material fact and the Defendants are entitled to judgment as a matter of law. Accordingly, Murphy's remaining claims will be dismissed.

## II. ANALYSIS

**A.  Standard of Review.**

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party." *Combs v. Meijer, Inc.*, No. 5:12-CV-209-KSF, 2012 WL 3962383, at *2 (E.D. Ky. Sept. 10, 2012) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In order to defeat a summary judgment motion, "[t]he nonmoving party must provide more than a scintilla of evidence," or, in other words, "sufficient evidence to permit a reasonable jury to find in that party's favor." *Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Summary judgment must be entered if, "after adequate opportunity for discovery," a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 940 (6th Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted)).

After reviewing the record, the Court finds no genuine issue of material fact exists as to Murphy's remaining claims. There is not evidence sufficient to permit a reasonable jury to find in Murphy's favor. Murphy has failed to make a showing sufficient to establish the existence of essential elements of the claims alleged, and thus, her claims fail as a matter of fact and law. As such, Defendant's motion for summary judgment should be granted.

### A. Murphy's § 1983 claims alleging violations of her Fourth and Eighth Amendment rights against Does 1-10.

Murphy asserts claims under § 1983 for violations of her Fourth and Eighth Amendment rights against Does 1-10.[1] She claims that they used excessive force while she was a pretrial detainee, which violated her Fourth and Eighth Amendment rights. (DE 1-1 at 5.)

---

[1] Murphy also asserted § 1983 claims against Morris and Lewis in their official capacities and the PCDC. These were dismissed on Defendants' motion to dismiss. (DE 10.) Defendants did not move at that time to have these claims dismissed against the Doe defendants.

Section 1983 provides a remedy for deprivations of rights secured by the Constitution and laws of the United States...." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982); *Mertik v. Blalock*, 983 F.2d 1353, 1359 (6th Cir.1993). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Whether the Fourth, Eighth, or Fourteenth Amendment applies to a claim of excessive force "depends on the status of the plaintiff at the time of the incident; that is, whether the plaintiff was a free citizen, convicted prisoner, or fit in some gray area in between the two." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). As the Sixth Circuit explained:

> The Fourth Amendment's prohibition against unreasonable seizures bars excessive force against free citizens, *see Graham v. Connor*, 490 U.S. 386, 388 (1989), while the Eighth Amendment's ban on cruel and unusual punishment bars excessive force against convicted persons. *See Whitley v. Albers*, 475 U.S. 312, 318–22 (1986). When a citizen does not fall clearly within either category—e.g., pretrial detainees—the Fourteenth Amendment's more generally applicable Due Process Clause governs to bar a governmental official's excessive use of force. *See Lanman v. Hinson*, 529 F.3d 673, 680–81 (6th Cir. 2008); *Phelps v. Coy*, 286 F.3d 295, 300 (6th Cir. 2002).

*Id*. The Fourth Amendment's reasonableness standard applies "at least through the booking process" and, in the case of a warrantless arrest, until a probable cause hearing is held. *Id*. at 474 (citing *Aldini v. Johnson*, 609 F.3d 858, 865–67 (6th Cir. 2010)).

Murphy does not allege in her Complaint that the alleged beating occurred while she was undergoing the booking process or prior to a probable cause hearing. In fact, the Complaint suggests the opposite. Murphy was arrested for flagrant non-support and the alleged beating did not occur until the next day, after she "was left in [Pike County Detention Center] custody. (DE 1-1 at 3.) Similarly, because Murphy was a pre-trial detainee and not a convicted person, she has failed to state a claim for violation of her Eighth Amendment rights. Accordingly,

8

Murphy has not plausibly alleged that her Fourth or Eighth Amendment rights were violated. Thus, these claims should be dismissed.

### B. Murphy's § 1983 claims alleging violations of her Fourteenth Amendment rights against Morris and Lewis in their official capacities and Does 1-10.

Murphy also asserts claims under § 1983 for violations of her Fourteenth Amendment rights. She claims that officers used excessive force while she was a pretrial detainee, which violated her Fourteenth Amendment rights.

To state a claim for excessive force pursuant to the Fourteenth Amendment, a pretrial detainee must demonstrate that an officer used force against her and that the conduct was objectively unreasonable. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015). Whether there was excessive force depends on whether the conduct was objectively reasonable under the specific circumstances of the case. Considerations include (1) "the relationship between the need for the use of force and the amount of force used"; (2) "the extent of the plaintiff's injury"; (3) "any effort made by the officer to temper or to limit the amount of force"; (4) "the severity of the security problem at issue"; (5) "the threat reasonably perceived by the officer"; and (6) "whether the plaintiff was actively resisting." *Kingsley*, 135 S. Ct. at 2473.

### 1. Murphy fails to establish any evidence that excessive force was used against her.

As an initial matter, there is not sufficient evidence to permit a reasonable jury to find in Murphy's favor. Murphy has had an adequate opportunity for discovery, and she has failed to establish the existence of essential elements of her claims. Aside from Murphy's medical records indicating that she had bruises and photographs of her physical condition, there is no evidence that she was beaten or otherwise assaulted at the PCDC. Murphy herself stated that she does not remember any beating. (DE 26 at 33.) Additionally, Wanda stated that she thought Murphy had been beaten "by looking at her[,]" and "no one at the hospital told [her] that [her daughter] had been beaten.] (DE 27 at 13-14.) The only other evidence placed in the record supporting

9

that some type of beating occurred or force was used against Murphy is Tina's testimony that Murphy did not have bruises the day of her arrest[2] and that an unknown doctor and nurse told her that Murphy had been beaten. But this evidence is insufficient to support that officers at the PCDC used excessive force or were at all responsible for Murphy's condition.

"In order to survive a motion for summary judgment, the non-moving party must be able to show 'sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy.'" *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004). Here, there is no evidence that anyone beat, struck, assaulted, or otherwise used excessive force on Murphy. Thus, there is not evidence to support essential elements of her claims, and summary judgment should be granted in favor of the Defendants.

### 2. Morris and Lewis, in their official capacities as Pike County Jailers, are entitled to summary judgment on Murphy's § 1983 claims.

Murphy brings § 1983 claims against Morris and Lewis in their official capacities as Pike County Jailers. Such claims are equivalent to claims against the jail, and therefore, the county. A § 1983 claim against a county official in his official capacity is properly treated as a claim against the county itself. *See Laubis v. Witt*, 597 F. App'x 827, 832 (6th Cir. 2015) ("The district court correctly held that the official capacity suit against [a county sheriff] should be treated as a claim against the county itself." (citing *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 556 (6th Cir. 2003)). To succeed on a § 1983 claim against a local government, the plaintiff "must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 573 (6th Cir. 2016) ("To succeed on a municipal liability claim, a plaintiff must establish that his or her constitutional rights were violated and that a policy or

---

[2] Tina and Wanda also testified that Murphy's mugshot did not show any bruising. The Court, however, has not been provided a copy of this mugshot.

custom of the municipality was the "moving force" behind the deprivation of the plaintiff's constitutional rights.")  First, the plaintiff must identify a policy or custom that caused the plaintiff's injury.  If the Plaintiff identifies an unofficial policy on behalf of the entity, she must show that although the policy was never formally approved, it was nevertheless so widespread as to have the force of law. *Brown*, 844 F.3d at 573.

Murphy asserts in her Complaint that there was a culture of abuse among the employees of the PCDC towards its inmates.  However, there is absolutely no evidence in the record to support this allegation.  Each of the witnesses from the PCDC testified that there was no culture of abuse among the employees of the jail toward the inmates and that the jailers were properly trained.  There is absolutely no evidence in the record to the contrary.  Because there is no evidence in the record of any policy or custom that was the "moving force" behind the deprivation of Murphy's constitutional rights, Morris and Lewis, in their official capacities,[3] are entitled to summary judgment with respect to Murphy's § 1983 claims.

**C. Vicarious Liability.**

Murphy asserts in her Complaint that Morris and Lewis are vicariously liable for the actions of Does 1-10.  The official capacity claims against Morris and Lewis are in essence claims against Pike County.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  Kentucky subdivisions are not liable, vicariously or otherwise, for the tortious performance of governmental functions or negligence of their employees. *See Howard ex rel. Estate of Howard v. Bayes*, 457 F.3d 568, 577 (6th Cir August 09, 2006) (citing *Grayson County Bd. of Educ. v. Casey,* 157 S.W.3d 201, 202-03 (Ky.2005); *Franklin County, Ky. v. Malone,* 957 S.W.2d 195, 201 (Ky.1997), *overruled in part on other grounds by Yanero v. Davis,* 65 S.W.3d 510 (Ky.2001)).  A plaintiff must allege specific,

---

[3] Morris and Lewis are entitled to official immunity with respect to Murphy's state law claims, as determined in the Court's opinion and order granting Defendants' motion to dismiss. (DE 10.)

11

personal wrongdoing on the part of each individual defendant—theories of vicarious liability are not sufficient. "[T]here must be some element of personal fault on the part of the officer or agent, such as negligence or deliberate wrongdoing." *Moores v. Fayette Cty.*, 418 S.W.2d 412, 414 (Ky. 1967) (internal citation and quotation marks omitted).

To the extent Murphy asserts claims under theories of vicarious liability, they must fail. Both Morris and Lewis were sued only in their official capacities. Thus, they are entitled to immunity. Additionally, the record of this case does not support any wrongdoing on the part of Morris[4] or Lewis. Thus, Morris and Lewis, in their official capacities, are entitled to summary judgment on all claims asserting theories of vicarious liability.

To the extent Murphy's Complaint could be read to assert claims under theories of vicarious liability against any of the Doe defendants, there is no element of personal fault alleged with respect to any of these unidentified individuals. A reasonable jury could not find in Murphy's favor on any claims asserting theories of vicarious liability. Thus, summary judgment is appropriate on these claims.

### D. Murphy's claims alleging intentional infliction of emotional distress against Does 1-10.

The only claims remaining are intentional infliction of emotional distress claims against Does 1-10. There is insufficient evidence to establish these claims such that a reasonable jury could not find in Murphy's favor. There is no evidence that any employee of the PCDC beat, assaulted, or otherwise used force against Murphy. Thus, summary judgment in favor of the Defendants is appropriate on these claims.

### E. Dismissal of claims against Does 1-10 pursuant to Fed. R. Civ. P. 4(m).

Defendants assert that the claims against Does 1-10 should be dismissed with prejudice pursuant to Fed. R. Civ. P. 4(m). Under Rule 4(m), "[i]f a defendant is not served within 90 days

---

[4] Morris did not work at the PCDC at the time of this incident.

12

after the complaint is filed, the court…must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m).

Murphy asserts that where the defendants are "Does," a plaintiff's failure to identify and serve those unknown defendants within the statutory prescribed 90-day limit does not require dismissal. Murphy asks that the Court give her additional time to identify and serve the Doe defendants. (DE 30 at 14-15.)

Additional time to identify and serve the Doe defendants is not warranted. Here, well over 90 days have passed since the filing of this Complaint. Additionally, the Court's deadline for joining parties and amending pleadings has also long passed. (*See* DE 13.) Finally, the parties in this case have completed discovery, and Murphy is still unable to identify Does 1-10. Murphy has had ample time to identify and serve the Doe defendants, and there is no reason sufficient to justify setting aside the requirement of dismissal under Fed. R. Civ. P. 4(m). Thus, the claims against the Doe defendants will be dismissed.

The question becomes whether the claims against the Doe defendants should be dismissed with or without prejudice. Typically, a dismissal under Fed. R. Civ. P. 4(m) is without prejudice. However, where the statute of limitations has run on a claim, "any dismissal ordered [under Rule 4(m)] … will be, in effect, with prejudice since plaintiff will be precluded from commencing a new action." *Petty v. County of Franklin*, 478 F.3d 341, n. 3 (6th Cir.2007) (citing 3 Moore's Federal Practice § 4.82[3]).

Here, the statute of limitations has run on Murphy's § 1983 claims, which arose on August 7, 2017. *See Collard v. Kentucky Board of Nursing*, 896 F.2d 179, 182 (6th Cir.1990) (applying one-year statute of limitations for § 1983 actions under Kentucky law). Accordingly, these claims will be dismissed with prejudice. However, intentional infliction of emotional distress claims have a five-year statute of limitations. Thus, the statute of limitations has not run on

13

these claims. As such, Murphy's intentional infliction of emotional distress claims against Does 1-10 will be dismissed without prejudice.

### F. Motion to withdraw as attorney. (DE 33.)

Murphy's attorney has filed a motion to withdraw as attorney for the plaintiff. The motion is vague and simply states that the attorney "believes that it is necessary for him … to withdraw as counsel for the Plaintiff[.]" (DE 33.)

The Local Rules provide, in relevant part,

[a]n attorney of record may withdraw from a case only under the following circumstances:

(a) The attorney files a motion, his or her client consents in writing, and another attorney enters his or her appearance; or

(b) The attorney files a motion, certifies the motion was served on the client, makes a showing of good cause, and the Court consents to the withdrawal on whatever terms the Court chooses to impose.

(c) In cases where an attorney seeks to be substituted for another as attorney of record, and both attorneys are within the same partnership or other legal professional association, a notice of substitution must be filed by the withdrawing attorney and the substitute attorney with an affirmative representation stating that the substitution is made with the client's consent; the notice may, but need not be, signed by the client.

LR 83.6.

It appears that counsel wishes to withdraw pursuant to LR 83.6(b). However, the motion fails to articulate "good cause." Accordingly, the motion will be denied without prejudice.

### III. CONCLUSION

Based on the foregoing, the Court **HEREBY ORDERS** as follows:

(1) Defendants' motion for summary judgment (DE 29) is **GRANTED**.

(2) Murphy's remaining claims pursuant to 42 U.S.C. § 1983 are **DISMISSED** with prejudice.

(3) Murphy's intentional infliction of emotional distress claims against Does 1-10 are **DISMISSED** without prejudice.

(4) The motion to withdraw as attorney (DE 33) is **DENIED** without prejudice.

(5) A separate judgment shall issue.

Dated July 27, 2020.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY